## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-210 |
| | : | |
| PASCAL GEDEON | : | |

## MEMORANDUM

PRATTER, J.                                                          JULY _14_, 2023

Although the Fifth Amendment prohibits coerced confessions, it offers no aegis to defendants who volunteer incriminating details to law enforcement officers while not in custody.

Pascal Gedeon filed three motions to suppress audio-recorded statements he made during a search of his home on October 17, 2019. Mr. Gedeon argues that the interview statements must be suppressed because he was not read his *Miranda* rights and he was allegedly coerced by the FBI agents conducting the interview. Having held an evidentiary hearing, the Court finds that, in these circumstances, Mr. Gedeon's statements are not shielded by the Fifth Amendment, and thus the Court denies each of Mr. Gedeon's motions to suppress.

### BACKGROUND

On May 20, 2021, a grand jury indicted Pascal Gedeon, charging him with violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) for the distribution and attempted distribution of child pornography. While represented by counsel, Mr. Gedeon filed his first motion to suppress the statements he had made on October 17, 2019 during the search of his home because he was not read his *Miranda* rights in advance of the interview and the FBI agents used coercive and duplicitous tactics in speaking to him. Mr. Gedeon then filed two motions to suppress his October 17, 2019 interview statements after electing to proceed *pro se*. The Government filed briefing in

opposition to the first motion, and the Court held a suppression hearing on the three pending motions to suppress the interview statements, among other pending motions, on June 1, 2023. Both parties elected to file post-hearing briefing.[1] The motions to suppress the statements are now ripe for disposition.

### FINDINGS OF FACT

The Court makes the following findings of fact, as relevant to Mr. Gedeon's motions to suppress. These findings are based on the testimony and exhibits admitted into evidence at the June 1, 2023 suppression hearing.[2]

Special Agent Daron Schreier, a 21-year veteran of the FBI, was for a period the primary case agent assigned to the investigation of Mr. Gedeon. June 1, 2023 Hr'g Tr. at 22:12–13, 23:5–8. On October 17, 2019, Special Agent Schreier led a team of 10 to 12 agents to execute a search warrant on Mr. Gedeon's residence at 481 Van Kirk Street in Philadelphia. *Id.* at 23:9–14, 23:22–24. The FBI arrived at Mr. Gedeon's home to execute the search at approximately 6:30 a.m. *Id.* at 23:25–24:2. The agents knocked on the exterior door to Mr. Gedeon's multiple-dwelling building and announced their presence, indicating that they had a search warrant. *Id.* at 24:3–7, 24:9–13. After a resident from another unit in the building opened the exterior door of the building, the agents knocked on the door to Mr. Gedeon's apartment, again indicating that they had a search warrant. *Id.* at 24:14–22. The agents waited a reasonable amount of time, then breached the interior

---

[1]     Mr. Gedeon filed a Motion to Extend Time under Federal Rule of Criminal Procedure 45, requesting additional time to file supplemental briefing while he awaited receipt of a transcript of the suppression hearing. The Court, having received and reviewed Mr. Gedeon's supplemental briefing prior to issuing this Memorandum, will grant Mr. Gedeon's Motion to Extend Time.

[2]     Special Agent Daron Schreier and Mr. Gedeon offered testimony during the suppression hearing. The exhibits admitted into evidence included the audio recording of the October 17, 2019 interview with Mr. Gedeon (Exhibit A), a transcript of the same recording (Exhibit B), and photographs of the entryway and living room, basement staircase, and basement bedroom of Mr. Gedeon's residence (Exhibits C, D, and E, respectively).

door to Mr. Gedeon's apartment after no one answered. *Id.* at 24:24–25, 75:9–15. Upon entry into the unit, the agents encountered Mr. Gedeon, his brother, and his mother. *Id.* at 25:1–5. Mr. Gedeon's brother failed to follow the agents' commands, struggled with the agents, flailed his arms, and took a confrontational stance. *Id.* at 25:6–14, 36:1–3. In light of Mr. Gedeon's brother's reaction, the agents placed Mr. Gedeon's brother and Mr. Gedeon in handcuffs for agent safety and to reduce the volatility of the situation. *Id.* at 25:15–26:2. After the agents cleared the residence, which took several minutes, the agents uncuffed Mr. Gedeon and his brother. *Id.* at 26:3–6, 77:10–14.

The agents informed Mr. Gedeon that they had a federal warrant to search the residence and to search and seize his electronic devices. *Id.* at 26:15–18, 36:11–37:12. Special Agent Schreier asked to speak with Mr. Gedeon, and Mr. Gedeon agreed to do so. *Id.* at 26:19–23, 64:15–23. Special Agent Schreier commenced the interview, which was audio-recorded, at approximately 6:50 a.m. *Id.* at 30:14–17; Oct. 17, 2019 Interview Tr. at 1:1–3.[3]

Special Agent Schreier and Special Agent Jacob McAdams conducted the interview in a bedroom in the basement of Mr. Gedeon's unit while the remainder of the agents conducted their search of the residence. June 1, 2023 Hr'g Tr. at 27:1–3, 34:18–22. Special Agent Schreier selected the bedroom because it was a more private location and out of the way of the search. *Id.* at 30:6–13, 78:6–14. Mr. Gedeon was not handcuffed or otherwise physically restrained during or after the interview. *Id.* at 33:2–6, 65:6–8. The bedroom had no interior door to close it off from the remainder of the residential unit, either at the top or the bottom of the basement stairs. *Id.* at 28:2–

---

[3] Although the transcript of Mr. Gedeon's interview is dated October 17, 2021, the testimony offered at the suppression hearing confirmed that the statements at issue were given on October 17, 2019, and neither Mr. Gedeon nor the Government objected to the admission of the interview transcript. June 1, 2023 Hr'g Tr. at 30:24–31:61, 48:2–5, 54:13–57:19, 76:21–25.

8. During the interview, Mr. Gedeon sat on the bed while Special Agents Schreier and McAdams stood at the foot of the bed. *Id.* at 28:14–22.

The agents advised Mr. Gedeon multiple times that he was not under arrest and that he was not required to speak with them. Oct. 17, 2019 Interview Tr. at 2:5–23, 24:21–25:8; June 1, 2023 Hr'g Tr. at 65:24–66:2, 70:21–71:2. The agents did not raise their voices during the interview, nor did Mr. Gedeon antagonize the agents during the conversation. June 1, 2023 Hr'g Tr. at 33:17–21, 67:17–23. The agents also did not threaten Mr. Gedeon in any fashion or promise him any outcome of the investigation. *Id.* at 32:5–8, 34:9–10, 67:24–68:9, 73:3–5. The agents' weapons were holstered during the interview. *Id.* at 33:9–10.

Mr. Gedeon did not get up to leave or state at any point during the interview that he wanted to stop the interview, nor did he request an attorney. *Id.* at 34:11–15, 66:6–14, 68:21–69:25. Mr. Gedeon appeared to understand the agents' questions, and the agents in turn understood Mr. Gedeon's responses and answered his queries. *Id.* at 33:24–34:4, 68:15–20.

The audio recording and transcript of the interview were fair and accurate representations of the agents' conversation with Mr. Gedeon. *Id.* at 31:3–5, 67:9–16. The agents did not ask Mr. Gedeon any substantive questions outside of the recorded interview, which lasted approximately one hour. *Id.* at 31:19–25, 34:16–17. At the conclusion of the interview, Mr. Gedeon was not arrested. *Id.* at 35:1–2.[4]

---

[4]     "It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Leveto*, 343 F. Supp. 2d 434, 442 (W.D. Pa. 2004) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993)). The recitation of facts above reflects the Court's credibility determination following the suppression hearing. Specifically, the Court found Special Agent Daron Schreier's testimony to be highly credible while a number of Mr. Gedeon's statements lacked credibility because there is no evidence in the record to support Mr. Gedeon's recollection of events as stated during the hearing.

First, Mr. Gedeon claimed that he was handcuffed and taken outside his residence for a period he estimates to be 30 to 45 minutes, while he was wearing only a towel. June 1, 2023 Hr'g Tr. at 54:15–55:19,

**LEGAL STANDARD**

A defendant may bring a motion to suppress before trial under Federal Rule of Criminal Procedure 12(b)(3)(C). Generally, the defendant seeking to suppress the evidence bears the initial burden of proof. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). But after the defendant establishes a basis for his motion, the burden shifts to the Government. *Id.*

**DISCUSSION**

Mr. Gedeon argues that the interview conducted on October 17, 2019 in his home must be suppressed because he was not read his *Miranda* rights despite the custodial nature of the interview, and his statements were involuntary because he was coerced by the FBI. The Government, in turn, argues that the motion to suppress should be denied in its entirety because Mr. Gedeon was not in custody during the interview and his statements to law enforcement were fully voluntary.

---

62:24–63:15. Special Agent Schreier testified that he did not recall Mr. Gedeon being taken outside in the cold and noted, based on the FBI report of the search warrant, that the FBI entered the residence at 6:30 a.m. while the interview of Mr. Gedeon began at 6:50 a.m.—that is, at most, Mr. Gedeon was restrained for 20 minutes. *Id.* at 77:10–19, 79:15–17. Special Agent Schreier also testified that Mr. Gedeon was clothed during the interview. *Id.* at 32:24–33:1, 79:18–22.

Second, Mr. Gedeon claimed that prior to the recorded interview, the agents had already commenced questioning him and restarted the questioning once it became clear that Mr. Gedeon was willing to cooperate. *Id.* at 55:20–56:21. Special Agent Schreier, on the other hand, testified that he had asked no substantive questions of Mr. Gedeon concerning the investigation apart from the questions asked during the audio-recorded interview. *Id.* at 79:23–80:1.

Third, Mr. Gedeon testified that he felt he could not leave the basement of his residence because the agents refused to give Mr. Gedeon his glasses during the interview and he remained clothed in only a towel during the conversation. *Id.* at 57:5–12. Special Agent Schreier did not recall any requests by Mr. Gedeon to access his glasses, testified that Mr. Gedeon was clothed, and stated that he had never interviewed a defendant in only a towel in all of his experience as an agent. *Id.* at 78:15–24, 79:18–22.

The Court does not credit Mr. Gedeon's recollection of these events. Considering the record as a whole, and particularly the audio recording and transcript of the interview, there is no indication at all that Mr. Gedeon or his brother were taken outside for an extended period of time while handcuffed, that the recorded interview was a retread of questions already asked of Mr. Gedeon, that Mr. Gedeon either asked for or was denied access to his glasses, or that Mr. Gedeon was wearing only a towel or asked to change into street clothes during the interview.

Neither of Mr. Gedeon's arguments is persuasive. The interview did not bear the hallmarks of a custodial interrogation, so the agents were under no obligation to read Mr. Gedeon his *Miranda* rights. Nor has Mr. Gedeon established anything approaching the degree of coercion that would necessitate the suppression of his statements. Therefore, the statements Mr. Gedeon gave on October 17, 2019 are admissible, and the Court denies Mr. Gedeon's motions to suppress.

## I.   Mr. Gedeon Was Not in Custody

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In light of that constitutional guarantee, before beginning a custodial interrogation, law enforcement must warn suspects of certain fundamental rights. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). These warnings "dispel the compulsion inherent in custodial surroundings," and therefore apply only when a suspect is in custody. *Id.* at 458; *accord United States v. Martinez*, 460 F. App'x 190, 193 (3d Cir. 2012*); United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006).

A suspect who has been formally arrested, or whose freedom of movement has been restrained to the same degree as that associated with a formal arrest, is "in custody" for *Miranda* purposes. *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010); *see also Willaman*, 437 F.3d at 359. The relevant test to determine whether a defendant was in custody is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 100 (1995); *see also Howes v. Fields*, 565 U.S. 499, 509 (2012). Courts in the Third Circuit consider five factors in determining whether a person who has not been arrested was in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave;
> (2) the location or physical surroundings of the interrogation;
> (3) the length of the interrogation;

(4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and
(5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359–60. Courts should also consider "the information known by the officer[s] concerning the suspect's culpability" and "whether the officer[s] revealed [their] belief that the suspect was guilty." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005). Ultimately, the inquiry focuses on "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howe*, 565 U.S. at 509.

Here, the question is not a close one: Mr. Gedeon was not in custody. The agents explicitly and repeatedly stated that Mr. Gedeon was not under arrest and that if Mr. Gedeon did not want to talk to them, he did not have to do so. *Cf. United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (finding a defendant was not in custody where "[n]o one told Defendant that he was under arrest or that he was not free to leave," even though authorities did not provide an affirmative statement that the defendant was free to terminate the interview). The interaction took place in his own home. *See United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) ("[A]n interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody."). The conversation was relatively short, lasting only one hour. *Cf. United States v. Ludwikowski*, 944 F.3d 123, 133 (3d Cir. 2019) (considering four hours of active questioning and seven hours of time spent at station and concluding the interview was not custodial). Although Mr. Gedeon was handcuffed when the FBI first entered his home, the agents explained to him why they had handcuffed him and his brother upon first breaching the apartment door, Mr. Gedeon was not handcuffed or otherwise physically restrained during the interview, Mr. Gedeon was repeatedly told that he was not under arrest, and Mr. Gedeon was permitted to freely leave his home—as he was not placed under

arrest—at the end of the interview. *Cf. United States v. McKenzie*, No. 20-cr-314, 2022 WL 16958658, at *4 (W.D. Pa. Nov. 16, 2022) (finding interrogation was custodial where defendant was handcuffed after approximately 20 officers entered his home, he remained in handcuffs while officers searched his house, car, and person, and after the search was completed, the defendant was arrested and transported to a police station). The agents used conversational tones during the interview, *see Ludwikowski*, 944 F.3d at 132, and while weapons were visible on the agents, they were holstered during the interview. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (stating that even where law enforcement agents were visibly armed during an interview, such a fact would not bear much weight in the analysis of whether a defendant was in custody because "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.").

A reasonable person in these circumstances would have believed that they would be able to terminate the interview. *See United States v. Woodson*, 30 F.4th 1295, 1304-06 (11th Cir. 2022) (finding, under similar circumstances, that a reasonable person would have felt able to terminate the interview and leave where defendant was informed he was not under arrest, was not handcuffed during the interview, and was not arrested until eight months after the search, even though the defendant had briefly been handcuffed in the living area of his home for the time necessary for the safe execution of the search warrant); *see also United States v. Czichray*, 378 F.3d 822, 830 (8th Cir. 2004) ("Where a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial.").

Thus, the October 17, 2019 interview was not custodial, so the agents had no obligation to provide Mr. Gedeon with any *Miranda* warnings prior to the interview.

## II.     Mr. Gedeon's Statements Were Voluntary

The Court turns to Mr. Gedeon's second argument that his statements are inadmissible because they were involuntary.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478. "In determining whether a confession was voluntary, we must satisfy ourselves that the confession was the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will and that the appellant's will was not overborne." *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975) (internal quotation marks omitted). A court determines if a confession was voluntarily made by evaluating the "totality of the circumstances surrounding the interrogation" to determine if the defendant made an uncoerced choice and had the requisite level of comprehension. *Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979); *see also Dickerson v. United States,* 530 U.S. 428, 434 (2000).

When determining voluntariness under the totality of the circumstances standard, courts must consider a number of factors in addition to "the crucial element of police coercion," such as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health" and the failure of police to advise the defendant of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993); *accord Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014). Notably, even if the government uses psychological tactics to obtain a statement from a suspect, a confession is still considered voluntary as long as the suspect's decision to confess is a "product of the suspect's own balancing of competing considerations."

*Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986). And where law enforcement coercion has been established, if such misconduct is not "causally related to the confession," then there is no basis for finding a due process violation. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Jacobs*, 431 F.3d at 108.

On review of the testimony presented at the suppression hearing and the exhibits submitted in connection with that hearing, the Government meets its burden easily. At the time of the interview, Mr. Gedeon was a 25-year-old adult who had earned his graduate equivalent diploma, attended some community college classes, had received no mental health diagnoses of any kind, and—although English is not Mr. Gedeon's first language—appeared to be comfortable and comprehending of the questions and responses of Special Agents Schreier and McAdams. June 1, 2023 Hr'g Tr. at 33:22–34:4, 58:6–8, 59:4–17. The interview lasted approximately one hour, which is generally not long enough to suggest coercion. *See Sweet v. Tennis*, 386 F. App'x 342, 347 (3d Cir. 2010) (finding no coercion where "entire questioning process . . . took only a few hours"); *see also Norcross v. Metzger*, No. 12-cv-09, 2020 WL 1532370, at *11, *14 (D. Del. Mar. 31, 2020) (considering detention of five hours and actual interrogation of three hours and ten minutes "not unusual" and holding that state court's determination that statement was voluntary was not unreasonable). As the Court has already remarked, Mr. Gedeon was not physically restrained during the interview, which took place entirely in his own home, and he was not arrested at the conclusion of the conversation.

Mr. Gedeon argues that the interview was coercive because the agents directly and implicitly stated on a number of occasions that it would not be in Mr. Gedeon's best interests to lie or withhold information from them. *See* Oct. 17, 2019 Interview Tr. at 6:5–8 ("We received

this information, you know, lying to us, or just not being forthcoming isn't going to help the situation at all, okay?"); *id.* at 13:14–17 ("So, like we've—like I said to you before, it's—if you lie to us and if you're not forthcoming, that's just going to make things more difficult for you, okay?"); *id.* at 47:24–48:2 ("So, one of the things we can do to try to verify that is you take what's called a lie-detector test or a polygraph examination."). An exhortation that an individual be truthful during an interview is simply not the type of tactic that is considered sufficiently coercive to warrant suppression of a statement. *See, e.g., United States v. Hadjiev*, 535 F. Supp. 3d 328, 334 (E.D. Pa. 2021) ("[A]n interrogator suggesting that a [d]efendant would benefit from providing truthful answers and making statements 'of possible lenience' does not violate *Miranda*."). Furthermore, the agents never falsely promised that complete honesty would result in any kind of leniency for Mr. Gedeon—indeed, Mr. Gedeon testified that the agents "didn't promise [him] anything." June 1, 2023 Hr'g Tr. at 73:3–5. The agents' recommendations to Mr. Gedeon that he truthfully and fully tell his side of the story were not coercive.

Mr. Gedeon further protests that the agents repeatedly presented him with a Hobson's choice—that is, either to admit that he had distributed child pornography online or to admit that he had himself kidnapped or assaulted minors. *See* Oct. 17, 2019 Interview Tr. 14:10–16 ("This is a good opportunity for you to tell us your side of the story, and how this happened, to what extent this is happening. Because when we walk out of here, we don't want to think you're the type of guy that's wandering the streets looking to pick up kids . . . ."); *id.* at 31:1–7 ("Again, that guy that's going out and looking to snatch kids off the playground is way different than the guy who's uploading or looking at it online, right? I think we can all agree on that. So that's what we want to get to, we want to get to the level of, like, which guy are you?"). Mr. Gedeon's argument is flawed for two reasons.

11

First, there is limited causal connection between the allegedly coercive conduct of the agents and certain of Mr. Gedeon's statements. That is because Mr. Gedeon admitted to using an email account registered with a Tumblr account that distributed child pornography *before* Special Agents Schreier and McAdams contrasted crimes committed online with potential crimes of kidnapping or assault committed offline. *See* June 1, 2023 Hr'g Tr. at 72:13–73:2. "Absent police conduct *causally* related to the confession," there is no basis for this Court to conclude that the FBI deprived Mr. Gedeon of the due process of law by somehow extracting an involuntary confession from him. *Connelly*, 479 U.S. at 164 (emphasis added).

Second, and more crucially, Mr. Gedeon's argument lacks merit because the agents' statements to which he cites did not make it impossible for Mr. Gedeon to make a rational decision on whether to provide or withhold certain information.[5] Law enforcement agents are not prohibited from employing psychological tactics or actively misleading a defendant in order to obtain a confession, so long as it remains possible for the defendant to make a rational decision. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969). There is no bright line dividing permissible psychological tactics from coercion, but the Supreme Court has identified the following examples as traversing beyond the pale: interrogation of a defendant for four hours while the defendant was incapacitated and sedated in an intensive care unit; interrogation of a medicated defendant for over eighteen hours without providing food or permitting sleep; holding a gun to the head of a wounded defendant to extract a confession; interrogation of a defendant for sixteen days in a closed cell without windows and only limited food; holding a defendant for four days with inadequate food and medical attention; holding a mentally challenged defendant incommunicado for three days and

---

[5]      To the contrary, during the interview, Mr. Gedeon exercised free choice in withholding relevant information from the agents about the nature of his employment. *See* Oct. 17, 2019 Interview Tr. at 82:15–17, 86:4–8; June 1, 2023 Hr'g Tr. at 66:15–67:8.

threatening him with mob violence; and a "relay" interrogation of a defendant by groups of officers for approximately 36 hours, without any rest for the defendant. *See Connelly,* 479 U.S. at 163 n.1 (collecting cases). Nothing of that ilk—indeed, nothing even *remotely* approaching such coercive conduct—is apparent here, and Mr. Gedeon was not "deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity v. State of N.J.,* 385 U.S. 493, 496 (1967) (internal quotation marks omitted).

The Court concludes that Mr. Gedeon's will was in no way overborne and he made his statements voluntarily. So, Mr. Gedeon's statements will not be suppressed on this basis.

\* \* \*

### CONCLUSION

For all of the foregoing reasons, and having considered the testimony and exhibits presented at the suppression hearing, the Court finds that the Government has met its burden to show that Mr. Gedeon was not in custody at the time of the October 17, 2019 interview and that Mr. Gedeon's statements were not extracted from him involuntarily. Thus, the Court denies Mr. Gedeon's motions to suppress. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE